**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

MARK JAMES ASAY,

      Petitioner,

v.                                                          Case No.  3:05-cv-147-J-32PDB

SEC'Y, FLA. DEP'T OF CORR., et al.,

      Respondents.

_____

## ORDER

### I. Status

Petitioner Mark James Asay is a death-sentenced inmate of the Florida penal system who is represented by counsel.[1]  He is proceeding in this action on a Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (Doc. #8) (hereinafter Petition).  Petitioner challenges his 1988 state court (Duval County) judgment of conviction for two counts of first degree murder.

The Petition raises the following grounds[2] for relief: (1) Petitioner's rights under the Sixth Amendment to the United States Constitution were violated when, during the trial, Petitioner informed the trial court that he wished to terminate the services of defense counsel, yet the trial court neither provided substitute counsel nor advised Petitioner that he

_____

[1] Petitioner is currently represented by Thomas G. Fallis, Esquire.

[2] In this paragraph, the Court summarizes the caption of each ground raised in the Petition.  Unfortunately, as will hereinafter be discussed in more detail, the caption of the ground often does not encompass or even pertain to many of the actual issues raised in the ensuing allegations in support of the ground.

had the right to proceed pro se; (2) Petitioner received ineffective assistance of counsel because counsel delegated the investigation of Petitioner's case to an investigator and failed to supervise or follow up on that investigator's work product; (3) Petitioner received ineffective assistance of counsel because counsel failed to meaningfully consult with Petitioner, failed to obtain and use relevant information about Petitioner and dropped all defense preparation when he was informed that Petitioner had confessed to the defense investigator; (4) Petitioner received ineffective assistance of counsel because counsel failed to meaningfully prepare for trial; (5) Petitioner received ineffective assistance of counsel because counsel believed that a first degree murder conviction in Petitioner's case was impossible and therefore failed to prepare for the trial and penalty phase, and he labored under the misconception that there could be no defense if Petitioner confessed; (6) Petitioner was denied a fair trial when racial evidence and argument tainted the trial process; (7) a State witness, Thomas Gross, admitted after trial that his testimony (that Petitioner was a racist) was a lie, that his testimony was coached, and the prosecutor suborned this conduct; (8) Petitioner received ineffective assistance of counsel because counsel advised Petitioner not to testify in his own behalf at trial and at the Spencer[3] hearing; (9) Petitioner received ineffective assistance of counsel because counsel conceded Petitioner's guilt during closing

---

[3] See Spencer v. State, 615 So.2d 688, 691 (Fla. 1993) (requiring trial judges, after receiving the jury's advisory verdict, to "hold a hearing to: a) give the defendant, his counsel, and the State, an opportunity to be heard; b) afford, if appropriate, both the State and the defendant an opportunity to present additional evidence; c) allow both sides to comment on or rebut information in any presentence or medical report; and d) afford the defendant an opportunity to be heard in person").

argument; (10) Florida's capital sentencing scheme is unconstitutional under Ring v. Arizona, 536 U.S. 584, 609 (2002) (holding that the Sixth Amendment right to a jury trial precludes a procedure whereby a sentencing judge, sitting without a jury, finds an aggravating circumstance necessary for the imposition of the death penalty); and (11) defense counsel failed to convey an offer of a plea to second degree murder.

Respondents have responded to the Petition. See Answer to Habeas Petition (Doc. #143) (hereinafter Response).[4]   Petitioner has replied. See Petitioner's Reply to Respondents' Answer on Writ of Habeas Corpus Memorandum of Law (Doc. #147) (hereinafter Reply). In his Reply, Petitioner abandons grounds one, seven, nine and eleven. Petitioner also states that he will rely on grounds six and eight as originally pled in the Petition. He asserts that his Reply addresses only grounds two, three, four, five and ten.[5] This case is now ripe for review.

## II. Procedural History

In the opinion affirming Petitioner's judgment of conviction on direct appeal, the Florida Supreme Court summarized the trial proceedings as follows:

---

[4] The Court hereinafter refers to the exhibits submitted with Respondents' Habeas Corpus Checklist (Doc. #144) as "Ex." Unless otherwise noted, the Court will cite the page number imprinted on the bottom center of each page of the pertinent exhibit, or if there is no page number on the bottom center of the page, the Court will cite the page number imprinted on the upper right corner of each page of the exhibit.

[5] Despite this assertion, Petitioner attempts to improperly raise new grounds for relief in his 165-page Reply that were not raised in the Petition. Respondents have objected to Petitioner's attempt to raise new claims in his Reply, and such objection is well-taken. The Court will hereinafter address why these additional claims are not properly before this Court.

According to testimony of Asay's brother, Robbie, and Robbie's friend, "Bubba" McQuinn, on July 17, 1987, the three met at a local bar where they drank beer and shot pool. They left the bar around 12:00 a.m. and went to a second bar where they stayed until closing at 2:00 a.m. Although Asay drank a number of beers, both Bubba and Robbie testified that Asay did not appear drunk or otherwise impaired.

After the bar closed, Robbie said he wanted to try to "pick up a girl" he had seen at the bar, so Bubba and Asay drove around the corner in Asay's truck. They returned to discover that Robbie had been unsuccessful with the girl he had seen, so Bubba suggested that they go downtown to find some prostitutes and he would pay for oral sex for them all. Asay and Bubba left in Asay's truck and Robbie left in his. Once downtown, Asay and Bubba soon spotted Robbie who was inside his truck talking to a black man, Robert Lee Booker. Robbie was telling Booker who was standing at the driver's side window of Robbie's truck that he and his friends were looking for prostitutes.

After spotting Booker standing by Robbie's truck, Asay told Bubba to pull up next to the truck. Asay immediately got out of his truck, proceeded to Robbie's truck, and told Robbie "You know you ain't got to take no s--t from these f---ing niggers." Although Robbie told Asay that "everything is cool," Asay began to point his finger in Booker's face and verbally attack him. When Booker told him "Don't put your finger in my face," Asay responded by saying "F--k you, nigger" and pulling his gun from his back pocket, shooting Booker once in the abdomen. Booker grabbed his side and ran. According to the medical examiner, the bullet perforated the intestines and an artery causing internal hemorrhaging. Booker's body was later found under the edge of a nearby house.

Robbie drove away immediately after the shooting. Asay jumped into the back of his truck, as Bubba drove off. When Asay got into the cab of the truck, Bubba asked him why he shot Booker. Asay responded, "Because you got to show a nigger who is boss." When asked if he thought he killed Booker, Asay replied, "No, I just scared the s--t out of him."

Bubba testified that after the shooting, Asay and Bubba continued to look for prostitutes.  According to Bubba, he saw "Renee" who he knew would give them oral sex.  It appears that at the time neither Bubba nor Asay was aware that "Renee" was actually Robert McDowell, a black man dressed as a woman.  According to Bubba, he negotiated a deal for oral sex for them both.  Bubba drove the truck into a nearby alley.  McDowell followed.  Bubba testified that McDowell refused to get into the truck with them both, so Asay left the truck and walked away to act as a lookout while Bubba and McDowell had sex.  As McDowell started to get into the truck with Bubba, Asay returned, grabbed McDowell's arm, pulled him from the truck and began shooting him.  McDowell was shot six times while he was backing up and attempting to get away.  Asay jumped back in his truck and told Bubba to drive away.  When asked why he shot McDowell, Asay told Bubba that he did it because "the bitch had beat him out of ten dollars" on a "blow job."  McDowell's body was found on the ground in the alley soon after the shots were heard.  According to the medical examiner, any of three wounds to the chest cavity would have been fatal.

Asay later told Charlie Moore in the presence of Moore's cousin, Danny, that he shot McDowell because McDowell had cheated him out of ten dollars on a drug deal and that he had told McDowell, "if he ever got him that he would get even."  Asay told Moore that he was out looking for "whores," when he came across McDowell.  According to Moore's cousin, Danny, Asay also told Moore that his plan was to have Bubba get McDowell in the truck and they "would take her off and screw her and kill her."  Moore testified that Asay told him that when Bubba "didn't have [McDowell] in the truck so they could go beat him up," Asay "grabbed [McDowell] by the arm and stuck the gun in his chest and shot him four times, and that when he hit the ground, he finished him off."  As a result of tips received from Moore and his cousin after McDowell's murder was featured on a television Crime Watch segment, Asay was arrested and charged by indictment with two counts of first-degree murder.

The state also presented testimony of Thomas Gross, who was Asay's cellmate while he was awaiting trial.  Gross testified that when the black prisoners, who were also housed in their cell, were out in the recreation area, Asay told him he was awaiting trial for a couple of murders.  According to Gross, Asay

5

then showed him some newspaper articles and told him, "I shot them niggers."  While they were discussing the murders, Asay showed Gross his tattoos, which included a swastika, the words "White Pride," and the initials "SWP" which Gross said stand for supreme white power.

Asay was found guilty of both murders.  In accordance with the jury's recommendations, the trial court imposed a sentence of death for each conviction.  The following two aggravating factors were found in connection with both murders: 1) the murder was committed by a person under sentence of imprisonment because Asay was on parole; and 2) Asay had been previously convicted of a capital felony based on the contemporaneous murder conviction. § 921.141(5)(a), (b), Fla. Stat. (1987).  In connection with the McDowell murder, the court found a third aggravating factor, that the murder was committed in a cold, calculated, and premeditated manner, without any pretense of any moral or legal justification. § 921.141(5)(i), Fla. Stat. (1987).  Asay's age of twenty-three at the time of the offenses was found in mitigation as to both murders. § 921.141(6)(g), Fla. Stat. (1987).

Asay v. State, 580 So.2d 610, 610-12 (Fla. 1991) (per curiam); Ex. 22 at 1-5.

On direct appeal, Petitioner raised the following claims: (1) the trial court erred by allowing racial prejudice to be injected into the trial; (2) the trial court erred in failing to advise Petitioner of his right to represent himself and to conduct an inquiry when Petitioner asked to discharge court-appointed counsel; (3) the trial court erred by failing to grant Petitioner's motion for judgment of acquittal on count one of the indictment charging him with the first-degree premeditated murder of Robert Lee Booker; (4) the trial court erred in denying Petitioner's pro se motion for a continuance of the penalty phase of the trial to enable him to secure additional mitigation witnesses; (5) the trial court erred in finding the McDowell murder was committed in a cold, calculated, and premeditated (hereinafter CCP) manner; (6) the death penalty is not proportionate for these murders because they were spontaneous,

6

impulsive killings during stressful circumstances; and (7) the prosecution improperly

diminished the jury's role in sentencing.  Ex. 20.  The Florida Supreme Court rejected these

arguments and affirmed.  Asay v. State, 580 So.2d at 612-14; Ex. 22 at 5-10.  Petitioner filed

a petition for writ of certiorari, see Ex. 23, which was denied on October 7, 1991.  Asay v.

Florida, 502 U.S. 895 (1991); Ex. 25.

On March 16, 1993, Petitioner filed a motion for post-conviction relief pursuant to Fla.

R. Crim. P. 3.850.  Ex. 26.  Thereafter, on November 24, 1993, he filed an amended motion

(hereinafter 3.850 motion), see Ex. 27, in which he raised the following twenty claims:

> (I) state agencies withheld public records; (II) the judge presiding over the trial was biased and trial counsel was ineffective for failing to recuse him; (III) the original trial judge should have recused himself from presiding over the postconviction proceedings because he is biased; (IV) trial counsel was ineffective during the guilt phase; (V) the jury instructions for the CCP aggravator failed to limit the jury's consideration and it was not supported by the evidence; (VI) the CCP jury instruction was unconstitutional and counsel was ineffective for failing to object; (VII) Florida's sentencing scheme is unconstitutional; (VIII) aggravating circumstances were overbroadly argued by the State; (IX) the trial judge erred in failing to find mitigation present in the record; (X) the penalty phase jury instructions shifted the burden of proof to the defendant; (XI) the prosecutor's inflammatory comments rendered Asay's trial fundamentally unfair; (XII) Asay was denied his right to an adequate mental health evaluation under Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); (XIII) ineffective assistance in the penalty phase; (XIV) the denial of Asay's motion for a continuance before the penalty phase to secure additional mitigation witnesses denied him due process and rendered counsel ineffective; (XV) the trial court prevented Asay from presenting mitigation evidence in violation of Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); (XVI) Asay's guilt phase counsel was ineffective for failing to present a voluntary intoxication defense; (XVII) the prosecutor improperly stated that sympathy could not be considered by the

> jury; (XVIII) the jury instructions unconstitutionally diluted the
> jury's sense of sentencing responsibility and counsel was
> ineffective for failing to ensure that the jury received adequate
> instructions; (XIX) prosecutorial misconduct rendered Asay's
> conviction unreliable; and (XX) Asay's trial court proceedings
> were fraught with errors that cannot be considered harmless
> when considered as a whole.

Asay v. State, 769 So.2d 974, 978 n.5 (Fla. 2000) (per curiam).

Additionally, on March 30, 1993, Petitioner filed a motion to disqualify the trial judge,

the Honorable Lawrence Page Haddock, III, from presiding over the 3.850 proceedings,

primarily on the basis of comments that the judge made during Petitioner's trial.  Ex. 26 at

75-82.  Judge Haddock denied the motion to disqualify.  Id. at 83.  After holding a Huff[6]

hearing, Judge Haddock denied many of Petitioner's claims, see Ex. 28 at 65-71, and

thereafter held an evidentiary hearing on Petitioner's ineffective assistance of trial counsel

claims.  See Ex. 30.  Following the evidentiary hearing, Judge Haddock denied relief on the

ineffectiveness claims as well.  Ex. 31.

Petitioner appealed to the Florida Supreme Court, raising the following issues:

> (1) judicial bias during the trial and postconviction proceedings
> resulted in a denial of "a fair and impartial tribunal throughout his
> proceedings in violation of his due process rights;" (2) the trial
> court improperly limited the scope of the evidentiary hearing by
> (a) limiting the testimony of some of Asay's siblings concerning
> mitigating evidence not presented during the sentencing phase;
> (b) limiting the scope of Asay's examination of his trial counsel
> regarding his knowledge of prior inconsistent statements of key
> witnesses; and (c) refusing to hear the testimony of Thomas
> Gross recanting his trial testimony; (3) ineffectiveness of counsel
> during the guilt phase for (a) failing to adequately impeach the
> State's key witnesses, (b) for failing to present a voluntary

---

[6] Huff v. State, 495 So.2d 145 (Fla. 1986).

> intoxication defense, and (c) for failing to rebut the State's arguments that he committed the crime due to his racial animus; (4) ineffectiveness of counsel during the penalty phase for (a) failing to investigate and present statutory mitigating evidence that he was acting under extreme emotional distress and his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, and (b) failing to present nonstatutory mitigating evidence of physical and emotional abuse and poverty during his childhood, alcohol abuse and his history of "huffing" inhalants; (5) the trial court improperly summarily denied several claims; [and] (6) cumulative error.

Asay v. Moore, 828 So.2d 985, 989 n.7 (Fla. 2002) (per curiam); Ex. 39 at 5 n.7.  After

hearing oral argument, the Florida Supreme Court affirmed the trial court's denial of the

3.850 motion on June 29, 2000.  Asay v. State, 769 So.2d at 978-90; Ex. 35 at 6-33.

Petitioner's motion for rehearing was denied on October 26, 2000.  Ex. 36.

On October 25, 2001, Petitioner filed a petition for writ of habeas corpus in the Florida

Supreme Court, in which he raised the following claims;

> (1) ineffective assistance of appellate counsel in failing to argue on appeal that Asay was absent during critical stages of the proceedings; (2) Asay's death sentences are unconstitutional because Asay was impermissibly limited from presenting mitigation, the trial court failed to consider and weigh mitigation, and the prosecutor made impermissible arguments regarding aggravation; (3) ineffective assistance of appellate counsel for failing to raise on appeal the trial court's failure to give a requested instruction on CCP; (4) ineffective assistance of appellate counsel for failing to raise on appeal penalty phase instructions that improperly shifted the burden of proof regarding the appropriateness of a life sentence; and (5) the unconstitutionality of Florida's capital sentencing statute and instructions given pursuant thereto.

Asay v. Moore, 828 So.2d at 989 n.8; Ex. 37.  On June 13, 2002, the Florida Supreme Court denied the petition.  Asay v. Moore, 828 So.2d at 989-93; Ex. 39.  The court denied Petitioner's motion for rehearing on October 4, 2002; Ex. 40.

On October 17, 2002, Petitioner filed a second motion for post-conviction relief, in which he contended that Florida's capital sentencing procedure is unconstitutional pursuant to Ring v. Arizona.  Ex. 41.  The circuit court denied the motion on February 23, 2004.  Ex. 43.  Petitioner appealed, and on December 20, 2004, the Florida Supreme Court affirmed the circuit court's order.  Asay v. State, 892 So.2d 1011 (Fla. 2004); Ex. 46.  Petitioner filed a petition for writ of certiorari, see Ex. 47, which the United States Supreme Court denied on November 2, 2009.  McNeil v. Asay, 558 U.S. 1007 (2009); Ex. 49.

This case has had a long and tortuous procedural history in this Court.  The case was initiated when Petitioner filed a letter (Doc. #1) on February 11, 2005, complaining about his attorneys' failure to timely file a federal habeas petition in this Court on his behalf.  On February 15, 2005, the Court entered an Order (Doc. #3), requiring his attorneys (Dale G. Westling, Esquire, and Mary Catherine Bonner, Esquire) to file a response to the letter.  In response, Petitioner's attorneys informed the Court that the one-year limitation period for Petitioner to file a federal petition would not expire for another five months.  On August 15, 2005, Ms. Bonner filed the Petition (Doc. #8) in this case.

On October 3, 2005, the Court entered an Order (Doc. #15) appointing Ms. Bonner to represent Petitioner for the limited purpose of addressing the timeliness of this action.  The Court also required the Respondents to file a limited response to the Petition in which they addressed whether the Petition was timely filed.  On October 12, 2005, the Respondents

10

filed Respondents' Limited Response in Opposition to the Petition for Writ of Habeas Corpus (Doc. #16), in which they asserted that the Petition was not timely filed.  Petitioner replied, arguing that the Petition was timely filed.  See Reply to Respondents' Limited Response in Opposition to the Petition for Writ of Habeas Corpus (Doc. #20), filed December 8, 2005.

The Court conducted oral argument on January 18, 2006, to address the timeliness issue.  Thereafter, on February 27, 2006, the Court appointed John S. Mills, Esquire, as co-counsel for the limited purpose of addressing the timeliness of this action, and he filed a supplemental brief on timeliness on July 5, 2006.  Mr. Mills then filed Petitioner's Amended Consolidated Supplemental Brief on Equitable Tolling (Doc. # 68)[7] on December 7, 2007.

On December 21, 2007, the Court entered an order notifying the parties that it intended to conduct an evidentiary hearing on the equitable tolling issue and consolidating Petitioner's case with the Thomas and Damren cases for purposes of addressing timeliness and equitable tolling.  The evidentiary hearing was held on February 21, 2008.  After post-hearing memoranda were filed, the Court, on February 10, 2009, denied the Respondents' request to dismiss this case as untimely, finding that equitable tolling was appropriate.  Respondents sought to appeal the order; however, on March 18, 2009, the Eleventh Circuit denied their request to appeal.  Thereafter, Respondents requested to stay these

---

[7] There were two other related cases that were briefed and argued with this case, Damren v. Sec'y, Fla. Dep't of Corr., Case No. 3:03-cv-397-J-32JRK, and Thomas v. Sec'y, Fla. Dep't of Corr., Case No. 3:03-cv-237-J-32TEM.  Mr. Mills was also appointed to represent Damren and Asay and to address timeliness and equitable tolling issues in all three cases.

proceedings while they sought review in the United States Supreme Court. On July 2, 2009, this Court granted the request.

The United States Supreme Court denied Respondents' petition for writ of certiorari on November 2, 2009; however, the Court required the parties to file briefs addressing whether the action should remain stayed pending the Supreme Court's decision in Holland v. Florida, 130 S.Ct. 2549 (2010). The parties agreed that this case should remain stayed until Holland was decided.

On June 25, 2010, the Court reopened this case and required the Respondents to inform the Court whether they wished to contest the equitable tolling issue further. See Order (Doc. #126). On August 2, 2010, Respondents notified the Court that they were not abandoning their position that the Petition was untimely, but agreed that proceeding to the merits of the Petition would be a more productive use of the parties' and this Court's time. See Notice to Court (Doc. #130).

On August 27, 2010, the Court appointed Thomas Fallis to represent Petitioner in this action. The Court gave successor counsel until November 30, 2010, to seek leave to file an amended petition. Thereafter, Petitioner sought and was granted an extension of time until February 28, 2011, to file an amended petition. However, on March 11, 2011, Petitioner filed a Motion to Proceed on Original Petition and Memorandum (Doc. #130), which was granted on April 11, 2011. Respondents filed their Response (Doc. #143) to the Petition on August 15, 2011, and Petitioner's 165 page Reply (Doc. #147) was filed on December 15, 2011. After completing work on other death penalty cases which had jumped ahead of this case

in light of the multiple delays in this action, the Court will now address the Petition on the merits.

### III.  Evidentiary Hearing

"In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007) (citation omitted).  "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Id.  The pertinent facts of this case are fully developed in the record before the Court.  Because this Court can "adequately assess [Petitioner's] claim[s] without further factual development," Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003), an evidentiary hearing will not be conducted.

### IV.  Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104-132, 110 Stat. 1214 (hereinafter AEDPA), this Court's review "is 'greatly circumscribed and highly deferential to the state courts.' Crawford v. Head, 311 F.3d 1288, 1295 (11th Cir. 2002)." Stewart v. Sec'y, Dep't of Corr., 476 F.3d 1193, 1208 (11th Cir. 2007).

> Under AEDPA, when a state court has adjudicated the petitioner's claim on the merits,[8] a federal court may not grant

---

[8] "[T]he highest state court decision reaching the merits of a habeas petitioner's claim is the relevant state court decision." Newland v. Hall, 527 F.3d 1162, 1199 (11th Cir. 2008). Additionally, in Harrington v. Richter, 131 S.Ct. 770, 785 (2011), the United States Supreme Court held that § 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"  The Court explained, "[w]hen a

habeas relief unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2). A state court's factual findings are presumed correct unless rebutted by clear and convincing evidence.[9] Id. § 2254(e)(1); Ferrell v. Hall, 640 F.3d 1199, 1223 (11th Cir. 2011).

AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, —— U.S. ——, ——, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 18, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003); Lockyer, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Williams v. Taylor, 529 U.S. 362, 410, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

---

federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Id. at 784–785.

[9] "This presumption of correctness applies equally to factual determinations made by state trial and appellate courts." Bui v. Haley, 321 F.3d 1304, 1312 (11th Cir. 2003) (footnote omitted) (citing Sumner v. Mata, 449 U.S. 539, 547 (1981)).

14

Bishop v. Warden, GDCP, 726 F.3d 1243, 1253-54 (11th Cir. 2013).

### V.  Procedural Default

### A. Exhaustion

A petition for writ of habeas corpus should not be entertained unless the petitioner has

first exhausted his state remedies.  See  Castille v. Peoples, 489 U.S. 346, 349, reh'g

denied, 490 U.S. 1076 (1989); Rose v. Lundy, 455 U.S. 509 (1982).

> Exhaustion requires that "state prisoners must give the state
> courts one full opportunity to resolve any constitutional issues by
> invoking one complete round of the State's established appellate
> review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119
> S.Ct. 1728, 144 L.Ed.2d 1 (1999); see § 2254(b), (c). That is, to
> properly exhaust a claim, the petitioner must "fairly present[ ]"
> every issue raised in his federal petition to the state's highest
> court, either on direct appeal or on collateral review. Castille v.
> Peoples, 489 U.S. 346, 350-51, 109 S.Ct. 1056, 103 L.Ed.2d
> 380 (1989) (quotation omitted).

Powell v. Allen, 602 F.3d 1263, 1269 (11th Cir. 2010) (per curiam).  A procedural default

arises "when 'the petitioner fails to raise the [federal] claim in state court and it is clear from

state law that any future attempts at exhaustion would be futile.'"  Owen v. Sec'y, Dep't of

Corr., 568 F.3d 894, 908 n.9 (11th Cir. 2009) (quoting Zeigler v. Crosby, 345 F.3d 1300,

1304 (11th Cir. 2003)).

### B. Presenting Claims in a Procedurally Correct Manner

In the process of exhausting a claim, a habeas petitioner must comply with all

independent and adequate state procedures.

> As a rule, a state prisoner's habeas claims may not be
> entertained by a federal court "when (1) 'a state court [has]
> declined to address [those] claims because the prisoner had
> failed to meet a state procedural requirement,' and (2) "'the state

15

> judgment rests on independent and adequate state procedural
> grounds.'"  Walker v. Martin, 562 U.S. ——, ——, 131 S.Ct.
> 1120, 1127, 179 L.Ed.2d 62 (2011) (quoting Coleman,[10] 501
> U.S., at 729–730, 111 S.Ct. 2546).

Maples v. Thomas, 132 S.Ct. 912, 922 (2012) (alteration in original).  The Eleventh Circuit

has set forth a three-part test to determine whether a state court's procedural ruling

constitutes an independent and adequate state rule:

> (1) the last state court rendering a judgment in the case must
> clearly and expressly state that it is relying on state procedural
> rules to resolve the federal claim without reaching the merits of
> that claim; (2) the state court's decision must rest solidly on state
> law grounds, and may not be "intertwined with an interpretation
> of federal law"; and (3) the state procedural rule must not be
> applied in an arbitrary or unprecedented fashion. Judd v. Haley,
> 250 F.3d 1308, 1313 (11th Cir. 2001) (citations omitted).

Powell, 602 F.3d at 1269.

### C. Cause and Prejudice

"The doctrine barring procedurally defaulted claims from being heard is not without

exceptions.  A prisoner may obtain federal review of a defaulted claim by showing cause for

the default and prejudice from a violation of federal law."  Martinez v. Ryan, 132 S.Ct. 1309,

1316 (2012) (citing Coleman v. Thompson, 501 U.S. 722, 750 (1991)).

> For purposes of the "cause and prejudice" method of
> overcoming a procedural bar, a petitioner shows sufficient cause
> if he can demonstrate "that some 'objective factor external to the
> defense impeded counsel's efforts to comply with the State's
> procedural rule.'"  Siebert,[11] 455 F.3d at 1272 (quoting Murray
> v. Carrier, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397

---

[10] Coleman v. Thompson, 501 U.S. 722 (1991).

[11] Siebert v. Allen, 455 F.3d 1269 (11th Cir. 2006).

(1986)).  External impediments sufficient to constitute cause "include evidence that could not reasonably have been discovered in time to comply with the rule; interference by state officials that made compliance impossible; and ineffective assistance of counsel at a stage where the petitioner had a right to counsel."  Mize,[12] 532 F.3d at 1190.

Owen, 568 F.3d at 908.

The Supreme Court recently expanded the circumstances in which the ineffective assistance of counsel may constitute cause, holding that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial."  Martinez, 132 S.Ct. at 1315.  "Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective."  Id. at 1320.

Once cause has been established, a petitioner must also demonstrate prejudice.  "As to the prejudice requirement, the petitioner must show 'that there is at least a reasonable probability that the result of the proceeding would have been different had the constitutional violation not occurred.'"  Owen, 568 F.3d at 908.

## D.  Actual Innocence

A petitioner may also obtain review of the merits of a procedurally barred claim to remedy a fundamental miscarriage of justice if he satisfies the actual innocence "gateway" established in Schlup v. Delo, 513 U.S. 298 (1995).

---

[12] Mize v. Hall, 532 F.3d 1184 (11th Cir. 2008).

17

> The "Schlup gateway" allows a petitioner sentenced to
> death to "raise[] a claim of actual innocence to avoid a
> procedural bar to the consideration of the merits of his
> constitutional claims." Id. at 867. The "Schlup gateway" is
> meant to prevent a constitutional error at trial from causing a
> "miscarriage of justice" and "the conviction of one who is actually
> innocent[.]" Id. at 865.
>
> To meet the proper standard, "the petitioner must show
> that it is *more likely than not* that *no reasonable juror* would have
> convicted him in the light of the new evidence." Id. at 867
> (emphasis added). This showing is more than that showing
> required to establish prejudice. Id. The Supreme Court in
> Schlup said this about the needed evidence: "[t]o be credible,
> such a claim requires petitioner to support his allegations of
> constitutional error with new reliable evidence—whether it be
> exculpatory scientific evidence, trustworthy eyewitness
> accounts, or critical physical evidence—that was not presented
> at trial." Id. at 865. In reviewing this evidence, courts are not
> bound by the usual rules of admissibility that would govern at a
> trial; and guilt is considered "with reference to a reasonable
> doubt." Id. at 867. "[A] petitioner must show that it is more likely
> than not that no reasonable juror would have found petitioner
> guilty beyond a reasonable doubt." Id.

Kuenzel v. Comm'r, Ala. Dep't of Corr., 690 F.3d 1311, 1314-15 (11th Cir. 2012) (per

curiam). In this case, Petitioner has neither claimed nor shown that he is actually innocent.

## VI.  Ineffectiveness Law

Petitioner raises several ineffective assistance of counsel claims. "To prevail on

th[ese] claim[s], [Petitioner] must meet both the deficient performance and prejudice prongs

of Strickland." Wong v. Belmontes, 558 U.S. 15, 16 (2009) (per curiam) (citing Strickland

v. Washington, 466 U.S. 668, 687 (1984)).

> To establish deficient performance, a person challenging
> a conviction must show that "counsel's representation fell below
> an objective standard of reasonableness." 466 U.S. at 688, 104
> S.Ct. 2052. A court considering a claim of ineffective assistance

18

> must apply a "strong presumption"[[13]] that counsel's representation was within the "wide range" of reasonable professional assistance. Id., at 689, 104 S.Ct. 2052. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id., at 687, 104 S.Ct. 2052.
>
> With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., at 694, 104 S.Ct. 2052. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id., at 693, 104 S.Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id., at 687, 104 S.Ct. 2052.

Harrington v. Richter, 131 S.Ct. 770, 787-88 (2011).  Since both prongs of the two-part

Strickland test must be satisfied to show a Sixth Amendment violation, "a court need not

address the performance prong if the petitioner cannot meet the prejudice prong, and vice-

versa." Ward v. Hall, 592 F.3d 1144, 1163 (11th Cir. 2010) (citation omitted).

"In considering claims that counsel was ineffective at the penalty phase of trial, [the

Court must] determine 'whether counsel reasonably investigated possible mitigating factors

and made a reasonable effort to present mitigating evidence to the sentencing court.'"

Stewart, 476 F.3d at 1209 (quoting Henyard v. McDonough, 459 F.3d 1217, 1242 (11th Cir.

---

[13] A court begins "with the 'strong presumption' that counsel's conduct was reasonable, Strickland, 104 S.Ct. at 2065; and that presumption is even stronger when we examine the performance of experienced counsel. Chandler v. United States, 218 F.3d 1305, 1316 (11th Cir. 2000) (en banc)." Walls v. Buss, 658 F.3d 1274, 1279 (11th Cir. 2011) (per curiam). The record reflects that Petitioner's attorney at trial, Raymond A. David, Jr., had been practicing law since 1979.  Moreover, he had handled numerous murder cases and had been an assistant public defender prior to representing Petitioner.  See Ex. 30 at 501, 633.

2006)); see also Porter v. McCollum, 558 U.S. 30, 39 (2009) ("It is unquestioned that under the prevailing professional norms at the time of Porter's trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background'") (quoting Williams v. Taylor, 529 U.S. 362, 396 (2000)).  With respect to the prejudice prong, Petitioner "must show that but for his counsel's deficiency, there is a reasonable probability he would have received a different sentence.  To assess that probability, we consider 'the totality of the available mitigation evidence - both that adduced at trial, and the evidence adduced in the habeas proceeding' - and 'reweig[h] it against the evidence in aggravation.'" Porter, 558 U.S. at 41 (quoting Williams, 529 U.S. at 397-398); see also Sears v. Upton, 130 S.Ct. 3259, 3267 (2010) (finding that a proper prejudice analysis must take into account the newly uncovered mitigating evidence, along with the mitigation evidence introduced during the defendant's penalty phase trial, to assess whether there is a reasonable probability that the defendant "would have received a different sentence after a constitutionally sufficient mitigation investigation") (citations omitted).

A state court's adjudication of an ineffectiveness claim is accorded great deference.

> The question "is not whether a federal court believes the state court's determination" under the Strickland standard "was incorrect but whether that determination was unreasonable - a substantially higher threshold." Schriro, supra, at 473, 127 S.Ct. 1933.  And, because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard. See Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

<u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009).   Thus, the standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, "and when the two apply in tandem, review is 'doubly' so[.]"  <u>Harrington</u>, 131 S.Ct. at 788 (quoting <u>Knowles</u>, 556 U.S. at 123).

## VII. Findings of Fact and Conclusions of Law

### A. Procedural Bar

In ground two, Petitioner contends that he received ineffective assistance of counsel because counsel delegated the investigation of Petitioner's case to an investigator, failed to supervise or follow up on that investigator's work product, and deferred to the judgment of his investigator rather than exercising his own judgment on the sufficiency of the investigation.  <u>See</u> Petition at 25-28.[14]  Respondents contend, and this Court agrees, that Petitioner never presented this ineffectiveness claim to the state courts; therefore, it is procedurally barred.  <u>See</u> Response at 25.

In his 3.850 motion, Petitioner generally complained that defense counsel failed to adequately investigate the case, <u>see</u> Ex. 27 at 28-29;[15] however, he never argued in state court that counsel completely delegated the investigation of Petitioner's case to an investigator and abdicated total responsibility for the factual preparation for trial to the investigator.  Therefore, ground two has not been exhausted.  It would be futile to dismiss this case to give Petitioner the opportunity to exhaust this ineffectiveness claim because it

---

[14] Because the pages of the Petition are not sequentially numbered, the Court cites the page numbers assigned by the Court's electronic filing system.

[15] This general "failure to investigate" claim will be addressed in Sections VII.B and VII.C of this Order.

21

could have and should have been raised in Petitioner's 3.850 motion and in the appeal of the denial of that motion.

Accordingly, ground two has been procedurally defaulted.  Petitioner has not shown either cause excusing the default[16] or actual prejudice resulting from the bar.  Furthermore, he has not shown that he is entitled to the fundamental miscarriage of justice exception. Thus, the Court need not reach the merits of ground two[17] because it is procedurally barred.

In ground eight, Petitioner contends that he received ineffective assistance of counsel because counsel advised Petitioner not to testify in his own behalf at trial and at the Spencer hearing.  Respondents contend that this ineffectiveness claim is procedurally barred, and this Court agrees.  See Response at 67-68.  Although Petitioner alleged in his 3.850 motion that counsel "effectively prevented Mr. Asay from testifying in his own behalf," Ex. 27 at 27, he did not include this issue in the appeal of the order denying the 3.850 motion.

Exhaustion requires that an appeal be taken from the denial of a post-conviction motion.  See Leonard v. Wainwright, 601 F.2d 807, 808 (5th Cir. 1979); Rodwell v. Singletary, 114 F.Supp.2d 1308, 1312 (M.D. Fla. 2000).  Furthermore, "in an appeal of a

---

[16] Petitioner does not argue that the ineffectiveness of post-conviction counsel constitutes cause for the default.  See Martinez, 132 S.Ct. at 1315.  In any event, such an argument would be unavailing because Petitioner's claim in ground two is without merit.  As the Florida Supreme Court found, "the trial court's factual finding that Asay's counsel conducted a reasonable investigation is supported by competent substantial evidence."  Asay v. State, 769 So.2d at 988; see also Response at 26-35.

[17] To the extent Petitioner may be attempting to raise additional ineffectiveness claims in ground two (other than the claim that counsel completely delegated the investigation of Petitioner's case to an investigator and abdicated total responsibility for the factual preparation for trial to the investigator), these other ineffectiveness claims will be discussed in Section VII.B and VII.C of this Order.

Rule 3.850 order after an evidentiary hearing, the movant is required to file an appellate brief, and a waiver of a claim results from submission of a brief without argument on a claim." Torres v. Sec'y, Dep't of Corr., No. 8:07-cv-1383-T-24TGW, 2008 WL 1897600, at *10 (M.D. Fla. Apr. 28, 2008) (citations omitted).  See also Stevens v. Sec'y, Dep't of Corr., No. 8:10-cv-2481-T-30AEP, 2011 WL 5359928, at *3 (M.D. Fla. Nov. 1, 2011).  Because Petitioner received an evidentiary hearing on his 3.850 motion, any issue not raised in his appellate brief on appeal of the denial of the 3.850 motion was waived.  See Cortes v. Gladish, 216 F. App'x 897, 899-900 (11th Cir. 2007) (per curiam).

It would be futile to dismiss this case to give Petitioner the opportunity to exhaust this ineffectiveness claim because it could have and should have been raised in the appeal of the order denying the 3.850 motion.  Accordingly, this ineffectiveness claim under ground eight has been procedurally defaulted. Petitioner has not shown either cause excusing the default[18] or actual prejudice resulting from the bar.  Furthermore, he has not shown that he is entitled to the fundamental miscarriage of justice exception.  Thus, the Court need not address ground eight[19] because it is procedurally barred.

_____

[18] Petitioner does not argue that the ineffectiveness of post-conviction counsel constitutes cause for the default.  Moreover, such an argument would not be well-taken because Petitioner's claim that counsel advised Petitioner not to testify and effectively prevented him from testifying is without merit for the reasons stated in Section VII.B of this Order.

[19] To the extent Petitioner may be attempting to raise additional ineffectiveness claims in ground eight (other than the claim that counsel effectively prevented Petitioner from testifying), these other ineffectiveness claims will be discussed in Section VII.B and VII.C of this Order.

23

## B. Ineffectiveness Claims at the Guilt/Innocence Phase[20]

Petitioner contends that he received ineffective assistance of counsel at the guilt/innocence phase of trial because counsel: (1) failed to adequately cross-examine the State's witnesses; (2) failed to call witnesses to prove that Petitioner was not a racist or to refute evidence of Petitioner's racism presented by the State; (3) failed to call defense witnesses or present a defense; (4) advised Petitioner not to testify;[21] (5) failed to meaningfully consult with Petitioner, to conduct sufficient pretrial investigation, and to adequately prepare for trial; (6) failed to object to admission of evidence which tied Petitioner to the type of gun used in the murders; and (7) failed to present a voluntary intoxication defense.  Petitioner raised these claims in his 3.850 motion, and after identifying <u>Strickland</u> as the controlling legal authority, the trial court adjudicated the claims as follows:

_____

[20] Petitioner's grounds raising ineffective assistance of counsel (grounds two, three, four, five and eight) are rambling, disjointed and repetitive.  Thus, the Court has struggled to ascertain what ineffectiveness claims  Petitioner is attempting to raise.  Additionally, it appears that Petitioner is attempting to raise ineffectiveness claims in the discussion of ground six, even though that ground purportedly raises an unfair trial claim based upon the admission of evidence regarding Petitioner's alleged racism.  However, because Petitioner alleges that he exhausted his ineffectiveness claims in state court, the Court has liberally construed the ineffective assistance of counsel claims raised in the Petition to be the same ineffectiveness claims raised in Petitioner's 3.850 motion.  To avoid being repetitious, the Court will first address the ineffectiveness claims raised in the Petition that pertain to the guilt/innocence phase of trial.  Then, the Court will proceed to the ineffectiveness claims raised in the Petition that pertain to the penalty phase of trial.  However, the Court will not address the ineffectiveness claims that Petitioner specifically abandoned in his Reply, which are grounds nine (counsel conceded Petitioner's guilt during closing argument) and eleven (defense counsel failed to convey an offer of a plea to second degree murder).

[21] As noted previously, this claim is procedurally barred.  However, the Court will address it in the alternative on the merits.

Claim IV also criticizes the trial defense counsel for failing to "challenge" the State's case by effectively cross-examining four State witnesses.   At the evidentiary hearing, these witnesses were not called by the defense,[22] so no showing was made as to what different information might have been elicited nor what different results might have come from a different, or more lengthy cross-examination.   While these witnesses' statements did contain some minor inconsistencies, the Court finds that there was no showing of any damage which could have been done to the State's case by pursuing them in some different manner.  Mr. David adequately and vigorously cross-examined State's witnesses O'Quinn, Floro, Danny Moore, and Charlie Moore.  Mr. David also vigorously attacked the credibility of these witnesses and conflicts in the evidence during his closing argument.  Mr. David's testimony effectively refutes the contention in this Claim that it would have been better strategy or tactics to pursue these minor inconsistencies any further than was done during the trial.[23]

The motion seeks to show that Mr. David was ineffective because he was unable to prevent the issue of race or racial hostility from being an issue at the trial.  Collateral counsel failed to make any showing whatsoever that any attorney, no matter how skilled, would have had any way of keeping the issue of race or racial hostility from being brought out in this trial.  The defendant made statements to witnesses which were extremely probative and relevant to the issue of premeditation. Part and

---

[22] Petitioner called the following witnesses at the March 1996 evidentiary hearing: (1) Raymond David, Jr., Petitioner's defense attorney at trial, see Ex. 30 at 497-697; (2) Barry M. Brown, a psychologist who evaluated Petitioner shortly before the evidentiary hearing, see id. at 703-78; (3) Faye Alen Sultan, a clinical psychologist who evaluated Petitioner in November of 1993, see id. at 782-858; (4) Joseph Asay, Petitioner's younger brother, see id. at 858-903; (5) Tina C. Logan, Petitioner's older sister, see id. at 921-63; (6) Eugene Mary Fox, Petitioner's older sister, see id. at 963-79; (7) Gloria Dean, Petitioner's older sister, see id. at 979-1004; (8) Robert C. Asay, Petitioner's older brother, see id. at 1004-17; and (9) Johnny R. Sharp, an inmate who had a sexual relationship with the Petitioner in jail.  See id. at 1129-1205.

[23]  Essentially, Mr. David testified that he attempted to point out major inconsistencies, but did not wish to lose effectiveness with the jury by belaboring every inconsistency.  See Ex. 30 at 557-59, 561-69, 593-600, 606-13, 624, 665-67.

parcel of this evidence were statements dealing with racial motivation for these killings.  The State was entitled to have them admitted, and their admission was affirmed on direct appeal.  Collateral counsel failed to show any method that could have been used to prevent these statements from being admitted, so the burden of proof is not met on this issue.

With regard to the issue of calling witnesses to testify that Mr. Asay was not a racist and coexisted peacefully with black inmates in prison, Mr. David testified that as part of his trial strategy he wished to preserve the defense's option of having two closing arguments at the guilt phase.  His decision not to call witnesses of marginal value at the price of losing this advantage was a valid trial tactic.  Mr. David is an extremely experienced and talented criminal defense lawyer, who was and is well able to weigh the value of such potential testimony against the high price of losing the second closing.  Mr. David testified that, even during the evidentiary hearing, when he was apprised by both sides of potential testimony by witnesses Stephens and Hunter, he would still choose not to call these witnesses in light of the tactical disadvantage.[24]  Mr. David also testified, and this Court agrees, that former inmates Hunter and Stephens, convicted felons and admitted racists themselves in their own right, were lacking in credibility, and would have benefitted the defendant's case very little, at great cost.[25]  Likewise Mr. David opined, and this Court agrees, that the testimony of Joe Collins, the former warden and psychologist at the Texas prison, was of minor if any value to the defense, while having the same negative result of forfeiting the second closing argument.[26]  Mr. David testified to the secondary negative aspect of Mr. Collins' testimony, in that on cross-examination he would have been required to reveal negative aspects of Mr. Asay's behavior while incarcerated in his institution, and this further weighed on the side of not calling this witness.[27]  The evidence on this issue fails to demonstrate any deficient performance or prejudice.

---

[24] See Ex. 30 at 663.

[25] See Ex. 30 at 663, 688-89.

[26] See Ex. 30 at 664.

[27] See Ex. 30 at 689-90.

The witness Johnny Sharp provided one of the most bizarre and amusing, albeit useless, moments of courtroom experience that the undersigned has ever observed. Interestingly, Collateral Counsel never questioned Mr. David about calling Mr. Sharp as a witness, or about what testimony he could have or should have elicited from Mr. Sharp at the trial, but this Court finds that a reasonably qualified attorney would have concluded that the chances of Mr. Sharp being allowed to give this testimony during the guilt phase were highly unlikely, indeed next to impossible.  Most certainly if this testimony had been heard by the trial jury during the guilt phase it would have the overall effect of being extremely harmful to the defendant's case. The fact that the State argued that the defendant's motivation was in part racial would not make evidence of a promiscuous and perverted sexual relationship in 1986, over one year prior to these murders, with a black fellow inmate at Tomoka Correctional Institute, admissible in the guilt phase.  Evidence of racial motivation does not make individual acts of alleged "non-bias" admissible. Further, Sharp's testimony that Asay loved him and did not feel threatened by other black inmates at Tomoka would absolutely conflict with the defense view that Asay had racist tattoos put on only in order to prevent harassment by black inmates. Sharp's testimony might have allowed the State to argue very effectively in closing that guilt or shame over his resorting to homosexual relationships in prison may have motivated him to hate blacks as a symbol and reminder of his past degradations. Not only was it not shown that every reasonably competent attorney would have called these witnesses, this Court finds that no reasonably competent attorney would have called Mr. Sharp as a witness.

This Claim further alleges that Mr. David failed to call available witnesses who would have testified that the physical evidence supported Mr. Asay's chosen defense, as well as witnesses who would have shown that the testimony of State witnesses was totally false, even impossible.  The Court finds that no evidence was presented during the evidentiary hearing to substantiate such allegations in the motion.  The evidence during the hearing failed to set forth what Mr. Asay's "chosen

27

defense" was.[28]  With regard to this Claim, the defense failed to carry the burden of proof, and no relief is warranted.

Concerning the issue of the defendant taking the stand, Mr. David dealt with this issue very effectively during his testimony in the evidentiary hearing.  Mr. David testified that the defendant had confessed to the crime when being interviewed by Mr. David's investigator.[29]  Not only had Mr. Asay confessed to the crime to Mr. David's investigator, in this confession he expressed the view that he would not get the death penalty even if he was convicted, because he had "only killed a nigger and a faggot".[30]  Mr. David was ethically prohibited as a member of the Florida Bar from putting Mr. Asay on the stand to deny committing the two murders, thereby giving testimony which Mr. David knew to be false and perjured.[31]  Further, the defendant Mr. Asay never testified at the evidentiary hearing that he wished to testify during the trial. Additionally, nowhere in the motion itself nor in the testimony at the evidentiary hearing is there any proffer of what testimony Mr. Asay would have given, had he taken the stand in the trial. Therefore, neither deficient performance of counsel nor prejudice has been demonstrated. No basis for relief exists as to this portion of the Claim.

With regard to the allegation in the motion that Mr. Asay pleaded with Mr. David to visit him to discuss his case and that Mr. David simply ignored these pleas, the record totally refutes these allegations.  Mr. David emphatically denied the allegation that the morning of the trial was the first time he had met with Mr. Asay, and in his testimony at the evidentiary hearing he

---

[28] In the 3.850 motion, Petitioner argued that "[t]rial counsel raised only one defense -- whether the State had established that Mr. Asay, as opposed to Bubba O'Quinn, was the actual perpetrator of these offenses." Ex. 27 at 17.  During closing argument, Mr. David argued that Bubba O'Quinn may not have reported the crimes to the police because "Bubba may have shot those people[.]" Ex. 7 at 846.

[29] See Ex. 30 at 639-40.

[30] See Ex. 30 at 642.

[31] Mr. David testified that he would have been placed in an "ethical dilemma" if he called witnesses to testify that Petitioner was innocent when Mr. David knew that Petitioner had committed the charged crimes.  Ex. 30 at 643.

stated that his investigator, Mr. Moncrief, had visited Asay on numerous occasions at the jail.[32]  Mr. David testified that the defendant had been provided with copies of all of the depositions taken, and that Asay had given him information and suggested questions for the witnesses at trial.

Mr. David did testify that Asay had sent his investigator on a number of "wild goose chases", and had been uncooperative with the defense team.[33] Mr. David categorically denied in his testimony that he had prevented the defendant from addressing the Court on his own.[34]  The trial transcript demonstrates that in fact Mr. Asay did on several occasions address the Court on his own.  Since Mr. Asay chose not to testify at the 3.850 evidentiary hearing, this testimony is unrefuted and the evidence presented during the hearing fails to demonstrate either deficient performance or prejudice in this regard.

The general allegation of failure to investigate or prepare for the trial was unsubstantiated by the evidence presented during the evidentiary hearing.[35]  Collateral Counsel failed to demonstrate what the alternative defense should have been, or what further investigation would have uncovered, had it been

---

[32] See Ex. 30 at 570-72.  The Court notes that Petitioner's trial was held in September of 1988 and the evidentiary hearing was held in March of 1996.  Mr. David was unable to recall how many times he met with Petitioner and where all of the meetings took place.

[33] See Ex. 30 at 640.

[34] See Ex. 30 at 671.

[35] Mr. David stated that his investigator, Mr. Ken Moncrief, interviewed Petitioner and his mother.  Ex. 30 at 642.  According to Mr. David, Mr. Moncrief told Mr. David that he attempted to obtain possible mitigation evidence from other family members, but was unsuccessful, and that he traveled to Tampa in an unsuccessful attempt to locate witnesses. Id.  Additionally, Mr. David testified that he personally "talked to a lot of people."  Id. at 694.  Mr. David also testified that he "took some of [the depositions]," but he was not sure if he "took all of them" because he was appointed to represent Petitioner after Louis Buzzell, Esquire (the attorney who had initially represented Petitioner and had conducted some investigation into the matter) was required to withdraw from the case.  Id. at 497-98, 502.  Mr. David testified that when he took over the case, he "sat down [with Mr. Buzzell] for some length of time and went through the file."  Id. at 652.

29

done.  At trial, the State presented eyewitness testimony as to both murders, as well as numerous incriminating statements by the defendant, made to these witnesses and others, both at the time of the crime and afterwards.  The testimony and arguments offered during the evidentiary hearing failed to show what evidence could or should have been offered which might reasonably have led to a different result at the trial.

With regard to the allegation that Mr. David was ineffective because he didn't object to alleged hearsay testimony concerning the fact that the defendant's girlfriend had purchased a gun, no testimony or other evidence was offered with regard to this issue during the evidentiary hearing whatsoever. Therefore, the defense clearly fails to overcome the presumption that this was a tactical decision made by an experienced, effective, and ethical attorney.  The record easily demonstrates the validity of defense counsel's decision not to object to this testimony. While the testimony at trial was that Elizabeth Phillips had purchased a .25 caliber semi-automatic Raven handgun, and that the State had been unable to locate her, the same witness also testified that Robbie Asay, the defendant's brother, also purchased an identical gun at the same time.  Given the facts that Robbie Asay was at the scene of both crimes, as established by the State's evidence, that the actual murder weapon was never recovered, and that lack of premeditation and conflicts in the evidence sufficient to create reasonable doubt were basically the only defenses available to Mr. David in this trial, it would appear that evidence indicating that Robbie Asay was in possession of a means of committing the crime was a very positive factor for the defense in this case.  This appeared to the Court to be effective and valid lawyering, and no ineffective assistance of counsel has been proven with regard to this issue.

. . . .

Despite the allegation in the motion that easily accessible evidence was available to show that Mr. Asay arrived at the Doghouse bar completely intoxicated, and that he arrived at the second bar so drunk that he could not drive, no such evidence was presented during the evidentiary hearing.  Even Robbie Asay, in his testimony at the evidentiary hearing, offered no opinion as to his brother's lack of sobriety on the evening of the

murders.   Mr. David was aware, as he testified, that the defendant had told Dr. Vallely he had drunk only beer on the night of the murders and had consumed no drugs; he also knew that the doctor's report indicated that the defendant's recollection of events before and after the murder was inconsistent with alcoholic blackout.   Therefore, Mr. David was acting as a reasonably competent attorney would, in deciding that voluntary intoxication, as a trial defense, should be ruled out.   He also testified at the evidentiary hearing that he had "been doing this for a long time" and that he "had never seen it (voluntary intoxication) work."[36]   Collateral Counsel failed to meet their burden of proof that every reasonably competent attorney would have utilized voluntary intoxication as a defense at the trial.  Mr. David's competency is demonstrated by the fact that, while he reasonably eliminated voluntary intoxication as a defense in the guilt phase, he did use Dr. Ernest Miller's testimony regarding intoxication in response to hypothetical questions during the penalty phase.   This Claim is without merit.

Ex. 31 at 3-8, 12-13.

On appeal of the order denying his 3.850 motion, Petitioner raised the following claims relating to the ineffectiveness of counsel during the guilt phase: (1) the failure to adequately impeach the State's key witnesses; (2) the failure to present a voluntary intoxication defense; and (3) the failure to rebut the State's argument that he committed the crime due to his racial animus.[37]   The Florida Supreme Court adjudicated these claims as follows:

In his guilt-phase ineffective assistance of counsel claim, Asay first argues that counsel failed to zealously pursue a reasonable doubt strategy, especially by failing to adequately

---

[36] See Ex. 30 at 657.

[37] The Court notes that the ineffectiveness claims raised in the Petition before this Court that were not included in the appeal of the order denying the 3.850 motion are procedurally barred.  However, with the exception of the two ineffectiveness claims identified in Section VII.A of this Order, Respondents do not assert that any ineffectiveness claims before this Court are procedurally barred, and the Court will not invoke this procedural bar *sua sponte.*

impeach the State's key witnesses.  However, the trial court found that the inconsistencies in the witnesses' previous versions of events were relatively insignificant and the reliability of the trial would not have been increased had the witnesses been further impeached.  See Van Poyck v. State, 694 So.2d 686, 697 (Fla. 1997).  As for Asay's second argument, counsel is not ineffective for failing to present a voluntary intoxication defense where no evidence of intoxication was presented.[38] See Kokal v. Dugger, 718 So.2d 138, 141 n.12 (Fla. 1998); Rivera v. State, 717 So.2d 477, 485 (Fla. 1998).  Third, Asay claimed that counsel was ineffective for failing to rebut the State's arguments that he committed the crime due to his racial animus.  The trial court found that the additional witnesses Asay asserts should have been presented at trial would have been subject to damaging impeachment.  See Haliburton v. Singletary, 691 So.2d 466, 470 (Fla. 1997); Garcia, 622 So.2d at 1327.  We find that even if counsel's performance was deficient for failing to discover these additional witnesses, no prejudice ensued.

After giving deference to the factual findings of the trial court and independently reviewing the court's legal conclusions, see Stephens v. State, 748 So.2d 1028, 1033-34 (Fla. 1999), we affirm the trial court's denial of Asay's claim that his guilt phase counsel deprived him of the constitutional right to effective assistance of counsel.

Asay v. State, 769 So.2d at 984-85.

Thus, there are qualifying decisions under AEDPA from the state circuit court and, with respect to the three claims raised on appeal of the order denying the 3.850 motion, from the Florida Supreme Court.  Next, this Court must consider the "contrary to" and "unreasonable application" components of the statute.  "It is the objective reasonableness,

---

[38] Mr. David testified that Petitioner had been examined by Dr. Vallely, and that Dr. Vallely's report reflects Petitioner drank only one beer and consumed no drugs on the night in question.  Ex. 30 at 647.  A copy of Dr. Vallely's report has been provided to the Court in an unmarked exhibit, located after Ex. 28 (Supplemental Volume III of the record on appeal of the order denying the 3.850 motion at State Exhibit 1).

not the correctness per se, of the state court decision that we are to decide." Brown v. Head, 272 F.3d 1308, 1313 (11th Cir. 2001), cert. denied, 537 U.S. 978 (2002).  Upon thorough review of the record and the applicable law, this Court concludes that the state courts' adjudications of these claims were not contrary to clearly established federal law,  did not involve an unreasonable application of clearly established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, Petitioner is not entitled to relief on his ineffectiveness claims pertaining to the guilt/innocence phase of trial.

### C. Ineffectiveness Claims at the Penalty Phase

Petitioner contends that he received ineffective assistance of counsel at the penalty phase of trial because counsel: (1) failed to obtain an adequate mental health evaluation of Petitioner and failed to provide necessary background information about Petitioner to mental health consultants; (2) failed to adequately investigate and prepare for the penalty phase; and  (3) failed to adequately challenge the State's evidence.  Petitioner raised these claims in his 3.850 motion, and the trial court adjudicated the claims as follows:

> This Claim alleges ineffective assistance of counsel at the penalty phase.  With regard to the issue of "serious mental and emotional health problems," the defendant was examined and evaluated by Dr. Vallely, a psychologist who has testified as an expert witness numerous times in this jurisdiction.  Mr. David received and reviewed Dr. Vallely's report.  As he testified in the evidentiary hearing, Mr. David made a reasonable decision that Dr. Vallely's testimony would not be helpful to the defense; in fact, he testified that introduction of Dr. Vallely's report "would hurt Mr. Asay more than it would help him."[39]  As Mr. David

---

[39] See Ex. 30 at 547.

testified, Dr. Vallely's report stated that Mr. Asay did not present a history consistent with neurological problems, and that his test results were consistent with anti-social personality disorder. The report also characterized Mr. Asay as deceptive and manipulative. Additionally, Mr. David testified that some of Dr. Vallely's notes made reference to Mr. Asay's hatred of blacks, his glue sniffing in prison, and possible sexual abuse by his stepfather, thus indicating that the expert was aware of all these matters in the defendant's background, prior to issuing his opinion with regard to the defendant's mental health.

Mr. David was entitled to rely on Dr. Vallely's report, and is not required, in order to be an effective advocate, to obtain another expert.   Mr. David's decision not to have Dr. Miller examine Mr. Vallely is therefore reasonable, especially considering his testimony that, based upon his prior dealings with Dr. Miller, he preferred to ask the doctor hypothetical questions.[40]   Declining to call a witness whose testimony is unfavorable is not ineffective assistance of counsel. Bryan v. Dugger, 641 So.2d 61 (Fla. 1994); Ferguson v. State, 593 So.2d 508 (Fla. 1992).  Dr. Vallely noted that he had not detected any signs of an emotional or cognitive disturbance, or of a psychotic process, and that he found the defendant's IQ to be within the low/average range, with normal frontal lobe functioning.  He also reported that the defendant told him he had only consumed beer that night, that he recalled the events before and after the murders, and that, while sexual assaults were committed against him in prison, the two in Texas had been committed by white men, and the assault by a black inmate had occurred in Florida, not Texas.   All of these statements in Dr. Vallely's report substantiate the reasonableness of Mr. David's decision not to use Dr. Vallely as a witness.  The fact that the defense has now secured a new expert who offers testimony more favorable to the defense is not a sufficient basis for finding ineffective assistance of counsel.  Turner v. Dugger, 614 So.2d 1075 (Fla. 1992); Rose v. State, 617 So.2d 291 (Fla. 1993).

While on the subject of mental health, specifically the testimony at the evidentiary hearing of the two collateral experts, Dr. Crown and Dr. Sultan, the Court finds that the testimony of

---

[40] See Ex. 30 at 661.

Dr. Crown was completely lacking in credibility. Dr. Crown's interesting theory of the defendant's condition being caused by huffing solvents while incarcerated and having been attacked by bees when he was three years old, such bee attack having left "neurotoxins" in his brain, seems to have been so overwhelming in the formulation of his opinion that he chose to ignore the entire trial transcript, chose not to discuss the actual murders in any way, shape or form with the defendant, opined that the defendant's feelings toward blacks were irrelevant, and felt a need to be aware of information about these crimes only "in a most global fashion".

This is especially interesting in light of the fact that none of the family members who testified during the evidentiary hearing made any mention of such an occurrence, despite their obvious interest in making known to this Court every negative thing that happened during the defendant's childhood.  One witness indicated that she was his chief caretaker during the time period in which the defendant told Dr. Crown he was attacked so horribly, and she made no mention of such an event occurring. Interestingly enough, Collateral Counsel never asked her to confirm Mr. Asay's clear (and convenient) memories of his third year, on which Dr. Crown relied without hesitation in diagnosing the defendant.

Dr. Sultan's testimony was of minimal impact, and she agreed that her evaluation of the defendant was not inconsistent with Dr. Vallely's diagnosis.  She acknowledged that the defendant was able to plan.  She described the witness as a "nonintellectual racist".  Like Dr. Crown, Dr. Sultan was unfamiliar with a number of aspects of the evidence in this case which tended to demonstrate mental competence and ability to premeditate, such as the defendant's statements that he was racially motivated in this crime, his statements to Mr. O'Quinn that he shot McDowell because he had beaten him out often dollars in the past, his statement to Danny Moore that there had been a plan to kill, and the defendant's attempt to change the appearance of his truck after the murders.  Dr. Sultan's description of Asay as a "nonintellectual racist" boggles the mind in light of the fact that the defendant had a number of racist tattoos placed upon his body.  In conclusion, there is no reasonable probability of a different result at sentencing, had either or both Dr. Crown and Dr. Sultan been called by the

defense in the penalty phase.  Certainly these witnesses would have provided insufficient basis for the judge or jury to overcome the aggravating circumstances which were proven.  At best, their opinions were speculative.

In the penalty phase, Mr. David introduced testimony from the defendant's mother, Veronica Baumgartner.  Through Mrs. Baumgartner, Mr. David presented to the jury a number of nonstatutory mitigation items, including his relative youth at the time of the offense, his affection toward her and his siblings, his artwork, his provision of financial help to his mother in the past, his remodeling of her house, his gifts of extra clothing to other inmates while incarcerated, his acquisition of his GED while incarcerated, and her belief that he could be rehabilitated.  (OR 1024-1030).[41]  He accomplished this in spite of, as he testified at the evidentiary hearing, Mrs. Baumgartner's evasion of his investigator when he called in pursuit of information about mitigation by pretending to be someone else on the telephone,[42] her lack of cooperation,[43] and her statement that her son had an explosive attitude and problems both in school and in prison.  These matters were also argued to the jury in the penalty phase of the trial by Mr. David as reasons to vote for a life sentence.  (OR 1057-1064).[44]

Mr. David testified that he made a reasonable and logical decision that matters about the defendant's abused childhood could constitute "double-edged swords".  (T 88-90, 223).[45]  Testimony about childhood abuse and testimony of the Texas witnesses were the types of things that, according to Mr. David's testimony "led, I thought, into the closet and trouble for Mr. Asay."[46]  (T 223, 239, 252-253).  Mr. Asay's prison record, in

---

[41] See Ex. 13 at 1022-31.

[42] See Ex. 30 at 640-41.

[43] See Ex. 30 at 656.

[44] See Ex. 15 at 1057-63.

[45] See Ex. 30 at 520, 522, 653

[46] See Ex. 30 at 657.

fact, has a number of disciplinary reports, indicating that he was not in fact such a good prisoner.  Mr. Asay's family, many of whom testified at the evidentiary hearing as to physical and mental abuse suffered by all of the family members when they were growing up, including Mr. Asay, did not come forward with this type of information in 1988.  Neither Mrs. Baumgartner nor the defendant volunteered any of this information, nor did they suggest such testimony could be obtained from other family members.  Additionally, none of the siblings have committed any antisocial act on the par of first degree murder, despite suffering the same childhood abuse.  Mr. David conducted a reasonable investigation for mitigation.   The defense has failed to demonstrate any prejudice in this area or any reasonable probability that a different sentence would have been imposed, had the additional family evidence been presented.

In addition, Mr. David gives reasonable testimony that a competent attorney would have believed that there were risks involved with offering this type of testimony, especially in light of the picture presented during the evidentiary hearing of a family at war with itself, committing domestic violence and inflicting permanent damage to one another at an early age.[47]   A reasonable person could well anticipate that a jury might find corroboration of a belief in the defendant's violence, rather than mitigation, in this testimony.  Additionally, the lengthy passage of time since this childhood abuse occurred, and the fact that none of the siblings have become murderers, indicates that a reasonable sentencer could quite well have found no significant weight to be attached to the testimony.  No relief is warranted as to this Claim.

Ex. 31 at 8-12.

Petitioner raised these issues on appeal of the order denying the 3.850 motion, and the Florida Supreme Court adjudicated the claims as follows:

1. Failure to Investigate and Present Mental Health Mitigation

---

[47] See Ex. 30 at 657.

Asay's original penalty phase counsel had him examined by a psychiatrist, Dr. Vallely. In his report, Dr. Vallely diagnosed Asay with antisocial personality disorder but found that Asay did not exhibit an "emotional or cognitive disturbance." Dr. Vallely also stated that Asay was manipulative and deceptive. Asay claims that his penalty phase counsel rendered ineffective assistance by failing to present readily available mental health mitigation. In addition, Asay alleges that his trial counsel failed to provide Dr. Vallely with adequate background materials, thus depriving him of an adequate mental health evaluation. In support of his claim, Asay presented the testimony of a psychologist and a psychiatrist.

This Court has found counsel's performance was deficient where counsel "never attempted to meaningfully investigate mitigation" although substantial mitigation could have been presented. Rose, 675 So.2d at 572; Hildwin v. Dugger, 654 So.2d 107, 109 (Fla. 1995) ("woefully inadequate" investigation failed to reveal a large amount of mitigating evidence, such as prior psychiatric hospitalizations and statutory mental health mitigators); State v. Lara, 581 So.2d 1288, 1289 (Fla. 1991) (finding counsel "virtually ignored" preparation for penalty phase).

However, in those cases where counsel did conduct a reasonable investigation of mental health mitigation prior to trial and then made a strategic decision not to present this information, we have affirmed the trial court's findings that counsel's performance was not deficient. See Rutherford, 727 So.2d at 223; Jones, 732 So.2d at 317; Rose v. State, 617 So.2d 291, 293-94 (Fla. 1993). This case is similar to Jones, where the defendant had been examined prior to trial by a mental health expert who gave an unfavorable diagnosis. As we concluded in Jones, the first evaluation is not rendered less than competent "simply because appellant has been able to provide testimony to conflict" with the first evaluation. 732 So.2d at 320; see Rose, 617 So.2d at 295. Also instructive is our opinion in Rose, where a psychologist advised trial counsel prior to the penalty phase that the defendant suffered from antisocial personality disorder and ruled out the possibility of an organic brain disorder. 617 So.2d at 294. In both Rose and Jones, we affirmed the trial court's finding that counsel had made a reasonable tactical decision not to further pursue an

investigation of mental health mitigation evidence after receiving an initial unfavorable diagnosis.  See Jones, 732 So.2d at 320 n.5; Rose, 617 So.2d at 294.

The trial court in this case made a factual finding that penalty phase counsel reasonably relied upon Dr. Vallely's report, which concluded that the defendant suffered from antisocial personality disorder and did not exhibit an "emotional or cognitive disturbance."  Further, the notes attached to the report indicate that Dr. Vallely was aware of most of the facts now advanced by collateral counsel, such as that Asay "huffed" solvents in prison, that he had been attacked by African-American inmates in prison, and that his stepfather was physically abusive.  Dr. Sultan, a clinical psychologist who testified for Asay at the evidentiary hearing, testified that the results of the psychological tests she administered were not inconsistent with the results garnered by Dr. Vallely and a competent psychologist could have reached Dr. Vallely's diagnosis.  As in both Rose and Jones, the trial court correctly found that trial counsel conducted a reasonable investigation into mental health mitigation evidence, which is not rendered incompetent merely because the defendant has now secured the testimony of a more favorable mental health expert.  See Jones, 732 So.2d at 320; Rose, 617 So.2d at 294.  Accordingly, we affirm the trial court's ruling that Asay has failed to establish that his trial counsel's performance was deficient because of his failure to introduce favorable mental health mitigating evidence.

Moreover, Asay has not established that any deficiency in counsel's performance "depriv[ed] the defendant of a fair trial, a trial whose result is reliable."  Strickland, 466 U.S. at 687, 104 S.Ct. 2052.  In assessing prejudice, "it is important to focus on the nature of the mental health mitigation" now presented.  Rutherford, 727 So.2d at 223.  At the evidentiary hearing, Asay presented the testimony of Dr. Sultan, a psychiatrist, and Dr. Crown, a psychologist.  Dr. Crown testified that Asay suffers from a neurological impairment that diminishes his ability to solve problems, engage in critical thinking, concentrate, shift from one idea to another, and understand the long-term consequences of his behavior.  As a result, Dr. Crown concluded that Asay met the statutory mitigating circumstances of acting under extreme emotional disturbance and being unable to conform his conduct to the requirements of law.

Dr. Sultan also testified that Asay suffered from long-standing mental health impairments, resulting in problems with impulse control, abstract problem solving, attentional problems and memory problems.  Like Dr. Crown, Dr. Sultan found that both statutory mental health mitigating circumstances were applicable to Asay.  In addition, she testified that nonstatutory mitigation was present, including that Asay had been a victim of severe emotional, physical and sexual abuse during his childhood; he had an extensive history of alcoholism; and he had organic brain damage.

The trial court found that the testimony of Drs. Crown and Sultan would not have been entitled to significant weight had it been presented in the penalty phase because neither expert was familiar with the significant facts of this crime and their diagnoses were speculative at best.  We agree.  See Rutherford, 727 So.2d at 224 (finding no error in trial court's assessment that "there is no evidence [the defendant's] disorder contributed to his actions in effecting the murder"); Rose, 617 So.2d at 293-94.  In Rose, we found that the trial court did not abuse its discretion in rejecting the expert evidence of mental health mitigation presented at the evidentiary hearing as "farfetched and unworthy of belief."  617 So.2d at 293.

Further, the nature of the evidence now presented does not undermine the reliability of the trial. Although Dr. Crown testified that Asay has organic brain damage, he also testified that this results in a deficiency in problem solving.  Dr. Sultan acknowledged that Asay had the capacity to formulate a plan and neither expert was surprised that Asay wrote extensive notes for his counsel during trial concerning the cross-examination of witnesses. The mitigation presented at the evidentiary hearing is of a qualitatively lesser caliber than in other cases where this Court found that counsel rendered ineffective assistance for failing to present mental health mitigation.  Compare Rose, 675 So.2d at 571 (defendant had previously been characterized as schizoid and suffered from organic brain damage and a longstanding personality disorder); Heiney v. State, 620 So.2d 171, 173 (Fla. 1993) (defendant diagnosed with borderline personality disorder); Phillips v. State, 608 So.2d 778, 783 (Fla. 1992) (defendant had a schizoid personality and was passive-aggressive); Lara, 581 So.2d at

40

1289 (the defendant's bizarre behavior signaled serious mental disorientation).

In aggravation, the trial court found applicable to both murders the aggravating circumstances that Asay was on parole at the time of the murders and that he had committed a contemporaneous murder. As for the McDowell murder, the trial court found and this Court upheld the additional aggravating circumstance that the murder had been cold, calculated and premeditated. In light of these aggravating circumstances, after giving deference to the factual findings of the trial court and independently reviewing the court's legal conclusions, see Stephens, 748 So.2d at 1033-34, we affirm the trial court's finding that the existence of this additional mental health mitigation does not undermine the reliability of the penalty phase proceeding.

2. Failure to Investigate and Present Other Mitigation

Asay also argues that his counsel rendered deficient performance for failing to investigate and present nonstatutory mitigation of his abusive and poverty-stricken childhood and his history of alcohol abuse and "huffing" solvents. At trial, counsel presented nonstatutory mitigation through Asay's mother that Asay was affectionate towards her, provided her with financial help in the past, remodeled her house, gave gifts of clothing to other inmates while incarcerated, and acquired his GED while in prison. In addition, during closing arguments, defense counsel emphasized Asay's relative youth at the time of the offense. At the evidentiary hearing, collateral counsel presented evidence of a childhood where Asay suffered severe beatings at the hands of his parents, was deprived of food, and at the age of twelve provided sexual favors to men in exchange for money.

Asay argues that the trial court's finding that his penalty phase counsel conducted a reasonable investigation is without support, and that penalty phase counsel could not have made a strategic decision not to use this testimony because he did not know the extent of available nonstatutory mitigation. During the evidentiary hearing, penalty phase counsel testified that he interviewed Asay and his mother concerning the existence of mitigating circumstances and his investigator contacted additional potential witnesses regarding mitigation. Trial counsel

41

testified that he was not aware of the extent of the abuse alleged in the 3.850 motion.  However, counsel also testified that he knew that there was "some evidence" that Asay's "childhood had not been a great one"[[48]] and that there had been problems with Asay's mother leaving her children alone for lengths of time.  We thus find the trial court's factual finding that Asay's counsel conducted a reasonable investigation is supported by competent substantial evidence, especially when coupled with penalty phase counsel's testimony as to the difficulty in obtaining information from Asay's mother.  See Rutherford, 727 So.2d at 225.

Even had Asay's counsel performed deficiently in failing to conduct an adequate investigation, we agree with the trial judge's conclusion that Asay has failed to establish prejudice as required by Strickland because the penalty proceedings were not rendered unreliable by this deficiency.  The trial court concluded that the defendant failed to establish prejudice because there is no possibility that this evidence would have outweighed the aggravating circumstances.  Unlike the mitigating evidence presented in Phillips, this evidence would have opened the door to damaging cross-examination regarding Asay's violent past.  We have previously recognized that a defendant is not prejudiced by the failure to introduce this type of nonstatutory mitigation when it would have opened the door to testimony of the defendant's violent past.  See Breedlove v. State, 692 So.2d 874, 877-78 (Fla. 1997); Medina, 573 So.2d at 298; see also Elledge v. Dugger, 823 F.2d 1439, 1445-48 (11th Cir.), vacated in part on other grounds, 833 F.2d 250 (11th Cir. 1987).   In this case, two of Asay's siblings testified on cross-examination that he had previously threatened to kill his brother's father-in-law.  The siblings also believed that Asay had stabbed his brother's dog.

Finally, when examining whether the defendant was prejudiced by the failure of counsel to present this nonstatutory mitigation, the Court must consider the nature of the aggravating and mitigating evidence presented in the penalty phase.  As discussed above, the trial court found applicable the statutory aggravating circumstances that the murder was committed while

---

[48] See Ex. 30 at 525.

the defendant was on parole and the defendant had a prior violent felony conviction for the contemporaneous murder. In the McDowell murder, the trial court additionally found the CCP aggravator to be applicable.

The evidence now asserted by Asay is potential nonstatutory mitigation. See Rutherford, 727 So.2d at 226. The question is whether in light of this additional mitigation evidence it is "reasonably probable, given the nature of the mitigation offered, that this altered picture would have led to the imposition of a life sentence, outweighing the multiple substantial aggravators at issue in this case." Id. In Breedlove, this Court concluded that the aggravating circumstances of prior violent felony, murder committed during the course of a burglary, and HAC overwhelmed the mitigation testimony presented concerning childhood beatings and alcohol abuse. 692 So.2d at 878. Likewise, this Court has reasoned that where the trial court found substantial and compelling aggravation, such as commission while under sentence of imprisonment, prior violent felonies, commission during a burglary, and CCP, there was no reasonable probability that the outcome would have been different had counsel presented additional mitigation evidence of the defendant's abused childhood, history of substance abuse, and brain damage. See Haliburton, 691 So.2d at 471. After giving deference to the factual findings of the trial judge and independently reviewing the trial judge's legal conclusions, see Stephens, 748 So.2d at 1033-34, we affirm the trial court's finding that in light of the aggravating circumstances, there is no reasonable probability that mitigation evidence of the defendant's abusive childhood and history of substance abuse would have led to the imposition of a life sentence. Accordingly, we affirm the denial of Asay's claim that his counsel was ineffective for failing to present this evidence during the penalty phase.

Asay v. State, 769 So.2d at 985-88.

Thus, there are qualifying decisions under AEDPA from the state circuit court and the Florida Supreme Court. These decisions are due "double" deference under AEDPA and Strickland. See supra at 18-21.

In evaluating this issue, the Court has considered precedent from both the Supreme Court and the Eleventh Circuit including, Cullen v. Pinholster, 131 S.Ct. 1388 (2011), Sears v. Upton, 130 S.Ct. 3259 (2010), Wong v. Belmontes, 558 U.S. 15 (2009) (per curiam), Rompilla v. Beard, 545 U.S. 374 (2005), Wiggins v. Smith, 539 U.S. 510 (2003), Puiatti v. Sec'y, Fla. Dep't of Corr., 732 F.3d 1255 (11th Cir. 2013), Cooper v. Sec'y, Dep't of Corr., 646 F.3d 1328 (11th Cir. 2011), and  Reed v. Sec'y, Fla. Dep't of Corr., 593 F.3d 1217 (11th Cir. 2010).  Based on that consideration and study of the record, the Court does question whether trial counsel performed an adequate mitigation investigation and whether counsel's mitigation presentation was too perfunctory.  Whether they were so lacking as to be constitutionally deficient on a de novo basis, I am not certain.  I do tend to agree with the Florida Supreme Court that, even if counsel's mitigation performance was deficient, Petitioner was not ultimately prejudiced thereby (as that term is defined in the cases).  Cf. Sears v. Upton, 130 S.Ct. at 3266 (to assess the probability of a different outcome under Strickland will necessarily "require a court to 'speculate' as to the effect of the new evidence").

Notwithstanding these concerns, this Court's review under AEDPA "is 'greatly circumscribed and highly deferential to the state courts.'" Stewart, 476 F.3d at 1208 (quoting Crawford, 311 F.3d at 1295).  AEDPA "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010).  The Florida Supreme Court directly addressed the mitigation issue both factually and legally and I cannot find that its decision was contrary to clearly established federal law, involved an unreasonable application of clearly established federal law or was based on an unreasonable

determination of the facts as found in the state court record.  Thus, Petitioner is not entitled to relief.  However, the Court will grant a certificate of appealability with respect to this claim.

## D.  Ground Six

Petitioner asserts that he was denied a fair trial when racial evidence and argument tainted the trial process.  Petition at 45-46, 56.[49]  The Florida Supreme Court summarily found this claim to have "no merit."  Asay v. State, 580 So.2d at 612 n.1.  Thus, there is a qualifying decision under AEDPA.

Upon thorough review of the record and the applicable law, this Court concludes that the Florida Supreme Court's adjudication of this claim was not contrary to clearly established federal law,[50] did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, Petitioner is not entitled to relief on ground six.

## E. Ground Ten

Petitioner contends that Florida's capital sentencing scheme is unconstitutional under Ring v. Arizona.  Petitioner raised this claim in his second 3.850 motion.  See Ex. 41.  The circuit court denied the motion, finding the claim to be without merit and finding that Ring

---

[49] The first page of this ground is on page 56, and the remaining portions of the claim are on pages 45-46.

[50] The State's theory of the case was that the murders were motivated by Petitioner's hatred of African-Americans.  As noted by Respondents, the United States Supreme Court has never held "that it is a violation of the right to a fair trial for the State to present its motive even when that motive is racial."  Response at 57.

does not apply retroactively to cases that were final when <u>Ring</u> was decided. Ex. 43. Petitioner appealed, and the Florida Supreme Court affirmed, conclusorily stating that "[t]he circuit court's order is hereby affirmed." Ex. 46.

Upon thorough review of the record and the applicable law, this Court concludes that the state courts' adjudications of this claim were not contrary to clearly established federal law,[51] did not involve an unreasonable application of clearly established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, Petitioner is not entitled to relief on ground ten.[52]

---

[51] Petitioner acknowledges in his Reply that the United States Supreme Court has held that <u>Ring</u> does not apply retroactively to cases that were final when <u>Ring</u> was decided. <u>See</u> Reply at 150-51 (citing <u>Schriro v. Summerlin</u>, 542 U.S. 348 (2004)). Moreover, the Eleventh Circuit has found that Florida's capital sentencing scheme is not unconstitutional under <u>Ring v. Arizona</u>. <u>See</u> <u>Evans v. Sec'y, Fla. Dep't of Corr.</u>, 699 F.3d 1249 (11th Cir. 2012) (finding that the Sixth Amendment does not require that specific findings authorizing imposition of a death sentence be made by a jury, and further finding that Florida's capital sentencing statute does not violate a defendant's Sixth Amendment rights as interpreted in <u>Ring v. Arizona</u>, because not only does a Florida jury render an advisory verdict addressing the existence of aggravating circumstances, but the sentencing judge must give the jury's sentencing verdict great weight), <u>cert</u>. <u>denied</u>, 133 S.Ct. 2393 (2013).

[52] In this ground, Petitioner also appears to argue that the jury instructions unconstitutionally diluted the jurors' sense of responsibility for sentencing because the jurors were advised that their recommendation regarding the appropriate sentence was merely advisory and the judge would make the final sentencing determination. <u>See</u> Petition at 54-55; <u>see</u> <u>also</u> <u>Caldwell v. Mississippi</u>, 472 U.S. 320, 328-29 (1985) (holding that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere"). However, in this case, "the prosecutor's and court's representation of the advisory role of the jury under Florida law was legally correct and, as a result, did not contravene <u>Caldwell</u>." <u>Johnston v. Singletary</u>, 162 F.3d 630, 643 (11th Cir. 1998) (per curiam) (citing <u>Romano v. Oklahoma</u>, 512 U.S. 1, 8 (1994) (finding that, "[t]o establish a <u>Caldwell</u> violation, a defendant necessarily must show

**F.  Grounds Raised in the Reply**

In the Reply, Petitioner attempts to raise the following new claims that were not presented in his Petition: (1) trial counsel was ineffective for failing to move to recuse Judge Haddock on the basis of judicial bias; (2) Judge Haddock erroneously denied Petitioner's 3.850 claim that the judge was in fact biased against Petitioner at trial; (3) Judge Haddock's bias against Petitioner permeated the entire case, as reflected in the order denying the 3.850 motion; (4) Petitioner was denied a full and fair evidentiary hearing on his 3.850 motion because the court refused to consider relevant admissible evidence at the hearing; and (5) the trial court erred in summarily denying many of the claims raised in the 3.850 motion without holding an evidentiary hearing on the claims.   These additional claims are not properly before this Court.

As noted previously, the Court gave successor federal habeas counsel approximately six months to prepare and file an amended petition.  However, on March 11, 2011, federal habeas counsel filed a Motion to Proceed on Original Petition (Doc. #136), in which he requested leave to adopt the original Petition filed by predecessor counsel.  In this motion, counsel also stated, "[i]n the event after further discovery and investigation of facts, counsel deems it necessary to amend, he will move at that time, pursuant to the appropriate rules and law, and ask for leave of Court." Id. at 1.  On April 11, 2011, the Court entered an order granting the Motion to Proceed on Original Petition (Doc. #136); however, the Court expressly stated that it was "not inclined to honor Petitioner's request to have leave to amend

that the remarks to the jury improperly described the role assigned to the jury by local law")).

in the future, absent extraordinary circumstances, because this Court previously gave successor counsel in excess of six months (from August 27, 2010, until March 11, 2011) to prepare and file an amended petition." Order (Doc. #137) at 1.

Thereafter, Petitioner neither sought nor was granted leave to amend. Nevertheless, in his Reply, he raises the new claims identified above. Thus, these additional claims are not properly before this Court. See Herring v. Sec'y, Dep't of Corr., 397 F.3d 1338, 1342 (11th Cir. 2005) (finding that arguments raised for the first time in a reply brief are not properly before a reviewing court). Moreover, Petitioner was on notice that he improperly raised these additional claims. See Respondents' Notice of Supplemental Authority/Objection (Doc. #148). However, Petitioner did not thereafter seek leave to amend his Petition to properly raise these claims. Accordingly, the Court need not address these improperly raised additional claims.

Even assuming Petitioner properly raised these new claims, they are without merit. With respect to Petitioner's claims regarding the court's alleged errors in handling Petitioner's 3.850 motion, the Eleventh Circuit has repeatedly held that such claims do not state a basis for federal habeas relief.

> Federal habeas relief is available to remedy defects in a defendant's conviction and sentence, but "an alleged defect in a collateral proceeding does not state a basis for habeas relief." Quince v. Crosby, 360 F.3d 1259, 1262 (11th Cir. 2004); see also Carroll v. Sec'y, DOC, 574 F.3d 1354, 1365 (11th Cir. 2009) (collecting cases), cert. denied, --- U.S. ----, 130 S.Ct. 500, 175 L.Ed.2d 355 (2009). There is a valid reason behind this principle: "[A] challenge to a state collateral proceeding does not undermine the legality of the detention or imprisonment - i.e., the conviction itself - and thus habeas relief is not an appropriate remedy." Carroll, 574 F.3d at 1365. Furthermore, such

challenges often involve issues of state law, and "[a] state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved." <u>McCullough v. Singletary</u>, 967 F.2d 530, 535 (11th Cir. 1992).

<u>Alston v. Dep't of Corr., Fla.</u>, 610 F.3d 1318, 1325-26 (11th Cir. 2010).

With respect to the judicial bias claims, the Florida Supreme Court thoroughly examined and rejected these claims[53] in the order affirming the denial of the 3.850 motion. <u>See</u> <u>Asay v. State</u>, 769 So.2d at 979-80, 981 (footnote omitted) (finding that "the comments attributed to the trial judge in the original trial are insufficient to show actual bias amounting to a denial of Asay's constitutional right to a fair and impartial tribunal," and further finding that the trial judge did not err in denying Petitioner's motion to disqualify himself from presiding over the 3.850 proceedings because "Asay's allegations are sheer speculation and do not constitute legally sufficient grounds to support a motion for disqualification").  The Florida Supreme Court also rejected Petitioner's ineffectiveness claim with respect to this issue. <u>See id.</u> at 981 n.13 ("Because we have found the grounds raised to have been legally insufficient to warrant disqualification, we further affirm the trial court's summary denial of Asay's claim that counsel was ineffective for failing to move to disqualify the trial judge on this basis at the time of the original trial.").

Upon thorough review of the record and the applicable law, this Court concludes that the Florida Supreme Court's adjudications of these claims were not contrary to clearly established federal law,  did not involve an unreasonable application of clearly established

---

[53] The court found the claims to be procedurally barred, but also addressed them on the merits in the alternative.

federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, Petitioner is not entitled to relief on these claims.

### VIII. Certificate of Appealability

This Court should issue a certificate of appealability only if the Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).

Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. See Slack, 529 U.S. at 484. However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Id. Upon consideration of the record as a whole, this Court will grant a certificate of appealability with respect to the following issue: whether Petitioner received ineffective assistance of counsel at the penalty

phase of trial because counsel failed to investigate, obtain and present additional mitigating evidence.  The Court will deny a certificate of appealability in all other respects.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1.      The Petition (Doc. #8) is **DENIED**, and this action is **DISMISSED WITH PREJUDICE**.

2.      The Clerk of the Court shall enter judgment denying the Petition and dismissing this case with prejudice.

3.      If Petitioner appeals the denial of the Petition, the Court grants a certificate of appealability with respect to the following issue: whether Petitioner received ineffective assistance of counsel at the penalty phase of trial because counsel failed to investigate, obtain and present additional mitigating evidence.  The Court denies a certificate of appealability in all other respects.

4.      Because this Court has determined that a certificate of appealability is warranted, Petitioner may proceed on appeal as a pauper.

5.      The Clerk of the Court shall close this case.

**DONE AND ORDERED** at Jacksonville, Florida this 14th day of April, 2014.

TIMOTHY J. CORRIGAN
United States District Judge

c:
Counsel of Record